**J. M. YOUNG, Plaintiff,**

v.

**ETHYL CORPORATION et al., Defendants.**

**No. ED–72–C–6.**

United States District Court,
W. D. Arkansas,
El Dorado Division.

Feb. 24, 1977.

Melvin T. Chambers, Chambers & Chambers, Paul C. Crumpler, Anderson & Crumpler, Magnolia, Ark., for plaintiff.

Robert J. Malinak, Baker & Botts, Houston, Tex., for defendants.

## MEMORANDUM OPINION

PAUL X WILLIAMS, Chief Judge.

The District Court's opinion in the original trial of this case appears at *382 F.Supp. 769 (1974)–(Judge Harris)*

On appeal the decision of the district of the district court was reversed and the case remanded. The opinion of the Court of Appeals (8th Circuit) appears at *521 F.2d 771 (1975)*. In the opinion of the Court of Appeals appears the following language:

" . . . In our view, if the Supreme Court of Arkansas were faced with this record, it would hold that the rule of capture does not apply, and that the defendants' actions in forcibly removing valuable minerals from beneath Young's land constitute an actionable trespass."

and at page 775:

"Accordingly, the appellant has a vested existing property right in the brominated salt water underlying his land, and the action of the defendants in forcibly removing that solution by means of injection and production wells on surrounding property constitutes an actionable trespass."

The Court of Appeals concluded by stating:

"The cause is remanded for further proceedings as to the relief to be granted."

Pursuant to that mandate, trial was resumed and evidence taken to determine the relief to which J. M. Young is entitled.

The jurisdiction of this court was announced in the first trial in the following language:

"Jurisdiction having been established by diversity, the substantive law of the State of Arkansas, as expressed by the State's highest court, is applicable. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Midstates Oil Corp. v. Waller*, 207 F.2d 127, 130, 131 (5 C.A.1953); 28 U.S.C.A. § 1652."

The statement of facts in the district court's published opinion in 382 F.Supp. 769 is a fair statement of the true facts with a few changes which have come to light since that trial. In that regard we note it is now stipulated that Mr. Young owns 169.1 acres rather than 180 acres as was first assumed; and the Court in this trial now finds that the Kerlin-Brine field contains 15,040 acres, as distinguished from the 16,000 acre figure assumed in the original trial. The Court finds that Mr. Young's 169.1 acres is a part of the 15,040 acre Kerlin field and constitutes 169.1/15,040ths thereof. The 15,040 acre Kerlin field is specifically described on a plat attached hereto as Appendix "A" and made a part of this opinion.

The defendant, Ethyl has caused both injection and production wells to be drilled. The injection wells form a rough circle on the periphery of the Kerlin field with the production wells operating within the circle.

The debrominated effluent is injected by means of the injection wells and the pressure forces the underground brine bearing bromine and other valuable minerals to the production wells.

The plaintiff's lands are surrounded by the lands leased and purchased in fee by defendants within the Southwest area of the Kerlin Brine Field. An injection well, number 13, is located adjacent to and South of the plaintiff's lands, which, as shown by a preponderance of the evidence, forces the product to production wells numbered 18 and 23. It is established, and undisputed, that the injection of debrominated waters from the defendants' plant through well numbered 13, under high pressure, displaces the brine waters in the formation underlying the plaintiff's lands, forcing it to move toward, and eventually produce through wells numbered 18 and 23. The salt water, by means of this artificially induced movement beneath the lands of Mr. Young, is carried to the processing plant where the valuable mineral bromine is removed and sold. This recycling process has continued since the inception of the production and processing in 1969. 382 F.Supp. 769, 772.

It is undisputed that Ethyl (by use of the injection and production wells) knowingly and forcibly removed valuable minerals from the lands of Mr. J. M. Young, and voluntarily commingled the brine bearing bromine and other valuable minerals from Mr. Young's land with that which it recovered from other such brine in the Kerlin field and from it, as commingled, produced bromine, ethylene dibromide, vinyl bromide and sulphur.

It is also undisputed that Ethyl obtained permits from the Arkansas Oil and Gas Commission for the drilling, location and operation of all its injection and production wells.

The Court finds that Arkansas has no laws either requiring or prohibiting the pooling or unitizing of a common source of such materials as those of the Kerlin field; and this court specifically finds that the 15,040 acre Kerlin field was and is a common source of supply of brine bearing bromine and other valuable minerals as that term is used by the Court of Appeals of the 8th Circuit in its opinion, reported at 521 F.2d 771, which stated the law of this case.

Since the law of this case was determined and announced by the Court of Appeals to be that the defendant's action in forcibly removing valuable minerals from beneath Mr. Young's land constitutes an actionable trespass it becomes necessary to determine whether or not the trespass was "willful" or "in good faith" as those terms are used in the law.

The defendant Ethyl contends that the trespass was "in good faith" and damages should be awarded on that theory.

The plaintiff Young contends that the trespass was "willful" and damages should be awarded on that theory.

The burden of proof is on defendant, Ethyl, to show that its trespass was "in

good faith." *Ward v. Spadra Coal Co.*, 168 Ark. 853, 857, 272 S.W. 353 (1925).

The evidence shows that Ethyl's salt water bromine recovery program in Columbia County, Arkansas, hereafter referred to as the Kerlin Field program, was very carefully planned and skillfully carried out by extremely capable and well financed people after obtaining top-flight legal advice from outstanding and able attorneys who sincerely believed it was the law of Arkansas that the Defendant could do just exactly what the defendant did, i. e. lease in a checkerboard fashion and put in operation both injection and production wells drilled to the Smackover formation in Kerlin field in Columbia County, Arkansas. In actual practice, Ethyl sought to obtain specially written leases from all the owners of those lands comprising the Kerlin field after obtaining the expert services of exceedingly able counsel in Arkansas to write a lease designed to cover a brine operation; and it sought both to buy the lands of J. M. Young and also to lease his lands. Ethyl offered to lease from him on the same terms as it leased from other land owners in the Kerlin field.

Mr. Young owned 169.1 acres of the 15,-040 acres comprising the Kerlin field, and he refused to sell or lease to the Defendant. Defendant knew it did not own or have a lease on the Young lands. There is no question as to boundaries and Defendant knew it did not have a lease or own any interest in his land or the minerals contained therein.

Defendant, Ethyl, relying on its expert legal advice that it had a legal right to inject water into lands adjoining Young's land and force the brine containing valuable minerals from under Young's land to production wells also on Defendant's leased lands, followed that course of action deliberately. There was no mistake by the defendant as to what it was doing or the fact that it intended to recover the brine and minerals from under the Young land. In the 1974 opinion, this Court (by Judge Har-

ris) held that there was no law violated by defendant's actions, i. e. not only did the defendant, Ethyl believe the law of Arkansas was not being violated by its course of action, but this court in its opinion reported at 382 F.Supp. 769 (1974) (opinion by Judge Harris) specifically found and announced as the law of Arkansas that Ethyl's course of action was within the law. Thus we see conclusively that it was the last and most recent announcement of the law of Arkansas until the Court of Appeals of the 8th Circuit reversed this district court and announced the law of this case to be that under the proved facts there was an actionable trespass.

■ An opinion of the Court of Appeals reviewing a decision of a district court in the 8th Circuit is the "law of the case" as announced by the circuit court in its reversing and remanding order. In the case of *Nucor Corp. v. Tennessee Forging*, 513 F.2d 151 (1975) at page 153 the court used the following language in discussing the "law of the case," to-wit:

When a case has been decided by this court on appeal and remanded to the District Court, every question which was before this court and disposed of by its decree is finally settled and determined. The District Court is bound by the decree and must carry it into execution according to the mandate. It cannot alter it, examine it except for purposes of execution, or give any further or other relief or review it for apparent error with respect to any question decided on appeal * *. *Thornton v. Carter*, 109 F.2d 316, 319–320 (8th Cir. 1940). See *Richardson v. Communications Workers of Amer., AFL–CIO*, 486 F.2d 801, 804 (8th Cir. 1973); *Cherokee Nation v. State of Oklahoma*, 461 F.2d 674, 677–678 (10th Cir.), cert. denied, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 489 (1972); *Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 177 (2nd Cir. 1967), cert. denied, 390 U.S. 956, 88 S.Ct. 1038, 20 L.Ed.2d 1151 (1968); *Paull v. Archer-Daniels-Midland Company*, 313

F.2d 612, 618 (8th Cir. 1963); 6A Moore's Federal Practice, Par. 59.16 (1974).

In 1975 the Court of Appeals for the Eighth Circuit declared and it is the law of this case that the Defendant's action was a trespass and that valuable minerals were taken. The trespass was an act done deliberately by very smart and able operators who intended to and skillfully did exactly what they deliberately planned to do, which was to remove brine bearing bromine and other valuable minerals from the Smackover formation under the lands belonging to J. M. Young.

At the same time we find that the motive of the defendant, Ethyl, was based on a sincere belief it had a legal right to do what it was doing.

Judge Harris's opinion reported in 382 F.Supp. 769 is enough alone to show conclusively that, in law, the trespass was in good faith.

In the case at bar we have also the written opinion of both Texas and Arkansas attorneys, well advised in such matters and completely able in the oil and gas legal business, who advised the defendant that its course of action was legal. The evidence heavily preponderates to a finding that the action of the defendant was "in good faith".

The Court specifically finds and holds in this case that the trespass of Ethyl was an "in good faith" trespass as that term is used in describing trespass and remedies for trespass.

Now we turn to the matter of a just and equitable remedy for trespass "in good faith"

The law of the State of Arkansas was discussed in the case of *National Lead Co. v. Magnet Cove Barium Corp.*, W.D.Ark., 231 F.Supp. 208 (1964) (Judge John E. Miller) where at pages 217–218 appears the following language:

> There are two general measures of damages for trespass to minerals which are described as the "mild" and the "harsh" rules. The "mild" rule applies where the trespass is inadvertent, innocent or not in bad faith, and fixes the damages as the value of the minerals in situ. The so-called "harsh" rule, applied when the trespass is wilful, intentional, or in bad faith, allows the injured party the enhanced value of the product at the time of conversion.

Within the framework of the mild measure, there are two different guidelines to determine the in-place value of ore: first, the royalty value whereby the injured party is allowed as damages an amount equivalent to the value of the privilege of mining and removing the minerals; second, another application of the mild rule allows the injured party to recover the value of the minerals after extraction less a credit to the trespasser of its production costs. The effect of allowing the royalty method as damages is not to punish the nonwilful trespasser, but to compensate the injured party for being deprived of the possibility of extracting the minerals. Alternatively, allowing the injured party to recover the enhanced value of the converted minerals with a deduction in favor of the trespasser for the cost of mining them will also compensate for being deprived of the right of mining the minerals and developing them, while preventing the trespasser from profiting from his wrongdoing. When the royalty method is used in applying the in-place measure of damages, the question of allowance to the trespasser of credit for his expenses in producing the minerals is not reached.

In the case at bar, the court specifically finds that the quantity of bromine bearing brine removed from the lands of J. M. Young prior to July 1, 1976 was 7,612,000 barrels. We adopt this figure as the finding of this court and it is based on the testimony of Defendant's witness Garms, and defendant's exhibit 77 introduced while Mr. Garms was giving his testimony. The Court recognizes that higher estimates were

made by other witnesses, especially the witnesses for the plaintiff. But Mr. Garms was offered as a witness by the defendant, Ethyl. He is an employee of Core Laboratories and owns no interest in the subject matter of this law suit. Mr. Garms' evidence (as shown by Defendant's exhibit 77) shows the number of barrels of brine recovered from Young's land in each of the producing years prior to July 1, 1976 and also the amount in pounds of bromine that was actually produced by Ethyl from the 7,612,000 barrels of brine. That amount is shown by years and totals 16,447,000 pounds. The pertinent part of exhibit 77 is as follows:

| 169.1 ACRE BASIS | |
|---|---|
| NET 5000 PPM* BRINE SWEPT | NET WEIGHT BROMINE SWEPT |
| $10^6$ STD BBLS | $10^6$ POUNDS |
| 1.057 | 2.282 |
| 3.374 | 7.284 |
| 1.700 | 3.671 |
| 0.834 | 1.801 |
| 0.234 | 0.504 |
| 0.430 | 0.930 |
| -0.017 | -0.025 |
| 7.612 | 16.447 lb |

*Note: PPM means "parts per Million".

The plaintiff contends that he is entitled to receive from Ethyl the market value of the bromine computed at the price published by the U. S. Department of Mines for the year shown plus interest at legal rate on the sales of each year. Mr. Paul Waddle, an expert witness for the plaintiff testified that the Bureau of Mines figures were as follows:

1969    19.01 cts  1970  17.32 cts    1971    17.35 cts
1972    16.46  "   1973  16.05  "     1974    27.24  "

Mr. Waddle further testified that approximately 95% of the valuable brine from Young's land had already been displaced by the recovery practices (injection and production wells) of Ethyl and estimated that the total value of bromine and sulphur displaceable from Young's land amounted to $6,584,134.00.

Exhibit 28 introduced as exhibit to Waddle's testimony is as follows:

AMOUNT AND VALUE OF ELEMENTAL BROMINE AND SULPHUR DISPLACEABLE FROM J. M. YOUNG LANDS

BROMINE-BEARING BRINE DISPLACEABLE FROM J. M. YOUNGS LANDS

Volume...................12,836,816 Barrels

Bromine Recovery..........2.1 Pounds per bbl

BROMINE DISPLACEABLE FROM J. M. YOUNGS LANDS:

Amount of Bromine........26,957,314 Pounds

Value of Bromine........$6,531,757

SULPHUR DISPLACEABLE FROM J. M. YOUNG LANDS

Amount of Sulphur........5,076,736 Pounds

Value of Sulphur.........$52,377

TOTAL VALUE OF BROMINE AND SULPHUR DISPLACEABLE FROM J. M. YOUNG LANDS........$6,584,134

On the other hand the defendant, Ethyl Corporation contends that since its trespass was in good faith, at most, it should pay only the value of the brine at the well head, or preferably only a royalty percentage on that, which value could be from nothing to as much as 5 cents a barrel.

While Ethyl forcefully urges that we are dealing with salt water or brine and its market value and royalty value, this Court specifically holds that we are dealing with the minerals, bromine, ethylene dibromide, vinyl bromide and sulphur.

The defendant Ethyl is in actuality the only defendant left in this law suit and it frankly admits that it is the one who operates the Kerlin field and it is the one who produced the brine from under Mr. Young's land, commingled it with the other field brine and extracted the valuable minerals therefrom and marketed them, the end products being marketed as bromine, ethylene dibromide, vinyl bromide and sulphur. Ethyl jealously guards its technical knowledge, does not intend to willingly make public the manner in which it operates, and did not permit the witnesses for the plaintiff to inspect its processing plant when plaintiff initially sought discovery in order to present its claim for damages. Ethyl zealously contends that at most, it is liable only for the value of the brine, or royalty per cent thereof. It starkly contends that it is entitled to profit from its trespass because of its skill and know-how; and that regardless of the trespass, Mr. Young should only receive what he would have received had he leased to Defendant in the beginning.

The Court notes that even if it were possible to inject 7,612,000 barrels of brine with exactly the same chemical content as that extracted from under Mr. Young's land

back into Young's land it would not negative the trespass. The injection process has occurred already. It is now impossible to undo what Ethyl has done. In fact, while Ethyl has shut down the closest injection well, which it did shortly after the Court of Appeals opinion in 1975, nevertheless it is still operating the field and is injecting effluent in tremendous quantity through other injection wells. The trespass has been committed. It can no more be undone at this time than one can unring a bell that has been rung or unfire a shot that has been fired.

Ethyl contends that its know-how and technical knowledge belong exclusively to it and that Mr. Young is not entitled to profit from these proprietary factors that belong exclusively to Ethyl, even though Ethyl has netted a large profit by its trespass.

The Court recognizes that Ethyl actually wrongfully removed the 7,612,000 barrels of brine prior to and up to July 1, 1976 and continues to operate the Kerlin field of which Mr. Young's land is a part. The injection and production well method is still being utilized and it is doubtless the best and proper way to make a maximum recovery from the Kerlin field.

The defendant, Ethyl Corporation commingled the brine from Young's land with vast quantities of other brine without the consent of Mr. Young and treated it and turned it into valuable merchandise. While Mr. Young contends that he is entitled to the full value of the bromine, etc., the Court finds that a more equitable remedy is indicated in this case where the size of the Kerlin field has been determined and we know the number of acres owned by Mr. Young.

Mr. Young made no contribution to Ethyl's investment in this plant and the gathering and treating facilities. However, he did not ask for or consent to the trespass, the commingling or the processing and disposing of the bromine, the dibromide, the vinyl bromide or the sulphur, or to the re-injection of the treated effluent back into the Smackover formation.

We note that the market value of the brine bearing bromine and other valuable minerals was and is very low (about 2 to 5 cents a barrel) and that Mr. Young could hardly be expected to provide himself with a $45,000,000 facility and an expensive operation to process his brine; but we also note that he is the victim of a trespass, which gives him the right to a fair and equitable remedy.

The defendant voluntarily processed the brine taken from Mr. Young and turned it into valuable merchandise and then sold it and has had the use of the sales money in increasing sums since 1969. Certainly defendant, Ethyl, should not be permitted to profit from its trespass.

The case at bar is not a coal, oil or mineral case in the sense that the Arkansas Supreme Court has up to this time considered and announced a specific remedy for the taking of brine bearing bromine and other minerals as has occurred here.

We have already quoted from the excellent opinion in the *National Lead Co. v. Magnet Cove Barium Corp.*, 231 F.Supp. 208 (1964) (authored by Judge Miller) and now quote from page 221 as follows:

As to a landowner who has not the opportunity nor the equipment to develop minerals, the amount for which he can lease them, or royalty value, is the generally accepted measure of damages as to him for an innocent trespass and conversion of minerals. However, as to the mineral lessee with the desire, ability and facilities to mine and develop minerals, the royalty value does not adequately compensate him for being deprived of the opportunity to exercise his mining rights. To place the mineral lessee in the position that he would have been had the injury not occurred is to at least compensate him for the net amount he would have realized by the exploitation of his mining rights as determined by the particular facts and circumstances of each case. The court has no desire to "punish" the defendant corporation, but at the same time it *must not allow a trespasser to profit from his own wrongdoing*. Thus,

the court is of the opinion that the in-place value as to a mining lessee, such as the plaintiff here, is the enhanced value of the ore with a credit to a nonwilful trespasser for its costs. By this approach the plaintiff mineral lessee is put in the place it would have been had it not been deprived of the opportunity of mining its ore, while at the same time depriving the trespasser of any profit from its wrong-doing, but yet inflicting no punishment on the trespasser by the allowance of its expenses or costs in removing and developing the ore. (Emphasis added.)

This Court is not unaware of the case of *Burbridge v. Bradley Lumber Co.*, 218 Ark. 897, 239 S.W.2d 285 (1951) in which remedy for innocent conversion of timber was discussed and the remedy announced by the Arkansas Supreme Court. In a unanimous decision the court used the following language at pages 902–903, 239 S.W.2d at page 288:

"The case at bar presents the issue of which rule this court is now going to follow as the law of this State. We are of the opinion that the rule as laid down in the *Eaton* case is the 'wisest and most just,' as stated there by Mr. Justice Battle, and we therefore follow that rule. Mr. Justice Battle said:

'In considering the justice of permitting the appellant to appropriate the cross-ties to his own use, the invasion of his rights and the injury done to him by appellee should not be overlooked. The trees belonged to him. They were standing upon his land, and he had the right to hold them as they were. No one had the right to take them from him, convert them into ties, and force him to accept their value at the time of the conversion. He may have preferred to have them to stand, and, if left standing for a few years, they might yield him great profit; and the enhancement of their value by the labor of appellee might be a poor compensation for the wrong done. But, whether he wished to sell or not, it would be gross injustice to permit appellee to force him to sell. He is entitled to the protection of the laws. Deny to him the right to the

cross-ties, and force him to accept the value of his timber when appropriated by a trespasser, as it was at the time of the conversion, and he had no adequate protection. The injury inflicted by the trespasser would be borne in part by the innocent owner, and the guilty would escape. "Such a doctrine," as said by Chief Justice Cooley, "offers a premium to heedlessness and blunders, and a temptation by false evidence to give an intentional trespass the appearance of an innocent mistake." '

In the *Eaton* case [*Eaton v. Langley*, 65 Ark. 448, 47 S.W. 123] it was recognized that in some instances the cost of conversion and the value added by reason of the conversion would be out of all proportion to the value of the original article, and the injustice of permitting a recovery of the value of the property as converted would be apparent at first blush. However, we are not dealing with an instance of that kind in the case at bar.

The original owner is entitled to recover the value of the property in its new form less the cost of labor, material and incidental items necessarily expended in transforming it, provided the expenditures do not exceed the increase in value which was added by the transformation, in which event he should recover the value of the property in its new form, less the increase in value."

The task of this Court is to announce a just and equitable remedy taking into consideration the law of the case as announced by the court of appeals, the Arkansas cases concerning remedy and all of the competent and relevant evidence submitted.

The Court refuses to find in this case that Mr. Young did not have the "desire" to develop the brine bearing minerals from his 169.1 acres and the Court finds that while it is "probable" that Mr. Young did not have the ability and the facilities to recover, and treat his minerals, we refuse to make a specific finding to that effect since in this day and time when the value of such minerals is at a high level and the market more readily available, there is a distinct possibil-

ity that Mr. Young could have mined and developed his own minerals or leased to someone who actually had the ability and the facilities. We specifically find that the Defendant, Ethyl, as a trespasser, is not entitled to profit from its own wrongdoing.

Here Defendant voluntarily used its expensive facilities, its skill and know-how and turned its brine and that of Mr. Young into something valuable; and we have only praise for the venture, know-how and the skill that has turned harmful, unwanted brine into a valuable asset and returned the de-brominated effluent into the Smackover formation.

We also recognize that it took not only the expensive facilities and the American resourcefulness, daring and know-how, but it also took money to defray the cost of the overall operation and make it possible to show a profit.

The records of Ethyl Corporation (carefully kept), as testified to by defendant's employee and witness, Mr. Andrew, (exhibit 92) show that the entire production of valuable minerals from the Kerlin field of 15,040 acres from the time it first began to operate in 1969 until July 1, 1976 amounted to $174,628,439.00.

From all the evidence in the case, this Court specifically finds that as of July 1, 1976 the Defendant without permission from Young, had removed 7,612,000 barrels of brine bearing valuable minerals and converted it into bromine, ethylene dibromide, vinyl bromide and sulphur. It was commingled with other brine from the Kerlin field

and was processed by the Defendant in its plant near Magnolia, producing:

| | |
|---|---|
| Elemental bromine worth | $ 4,540,596.00 |
| Ethylene dibromide worth | 154,394,476.00 |
| Vinyl bromine worth | 14,087,900.00 |
| Sulphur worth | 1,605,467.00 |
| Making a grand total of | $174,628,439.00 |

produced from the 15,040 acre field including the brine from Mr. Young's land (169.1 acres); and that in producing these valuable products the Defendant used its plant, its gathering facilities and treatment plants which were necessary for it to use in processing its own legally acquired bromine bearing brine.

Mr. Young also contends that he is entitled to his per acre share of this total sum without in any way having to contribute to the cost of the operation.

The Court finds that since it was a "trespass in good faith" it is more equitable that the cost of the operation should also be considered because even though the defendant committed a trespass against Mr. Young it was plainly entitled to process its own brine and had it not been processing its own brine there would have been no processing of the brine from Mr. Young's land.

Defendant's Exhibit 92 (Mr. Andrew) shows from the carefully kept records of Ethyl that the cost of producing the merchandise was $75,021,000 for the period of time from 1969 up to July 1, 1976.

Ethyl's cost figures, as carefully kept and computed by Ethyl's witness, Mr. Andrew is set forth in Defendant's Exhibit 92 as follows:

| Costs, $M | '69 | '70 | '71 | '72 | '73 | '74 | '75 |
|---|---|---|---|---|---|---|---|
| Brinefield and wells | 1,788 | 3,525 | 3,389 | 3,685 | 3,764 | 6,408 | 5,652 |
| Chlorine; net brinefield | 536 | 1,428 | 1,255 | 1,357 | 1,893 | 2,369 | 3,155 |
| Other chemicals | 151 | 226 | 139 | 154 | 202 | 257 | 201 |
| Utilities | 310 | 684 | 721 | 809 | 1,346 | 1,085 | 1,347 |
| Plant factory & trailers | 469 | 984 | 665 | 734 | 843 | 1,146 | 1,158 |
| Depreciation | | | | | | | |
| Brinefield & wells | 207 | 567 | 551 | 635 | 608 | 719 | 964 |
| Plant | 329 | 675 | .611 | 607 | 621 | 796 | 756 |
| Supplemental | | | | | | | |
| R&D Technical Service | 269 | 730 | 318 | 551 | 339 | 282 | 254 |
| Engineering | 49 | 10 | 6 | 7 | 30 | 85 | 112 |
| Legal | 26 | 16 | 6 | 12 | 18 | 33 | 31 |
| Marketing | 30 | 33 | 36 | 40 | 43 | 46 | 50 |
| Administration | 211 | 75 | 80 | 90 | 100 | 80 | - |
| Finance | 60 | 66 | 72 | 80 | 86 | 92 | 100 |
| Total Supplemental | 645 | 930 | 518 | 780 | 616 | 618 | 547 |
| Knowhow | 110 | 216 | 216 | 216 | 216 | 216 | 216 |
| Subtotal | 4,545 | 9,235 | 8.065 | 8,977 | 10,109 | 13,614 | 13,996 |
| Interest at 6% | 411 | 941 | 920 | 822 | 797 | 1,205 | 1,384 |
| | 4,956 | 10,176 | 8,985 | 9,799 | 10,906 | 14,819 | 15,380 |

The Court finds these costs to be correct and totals $75,021,000.

When the cost of $75,021,000 is deducted from the total income of $174,628,439.00 it is revealed that the net profit to Ethyl from the total Kerlin field operation up to July 1, 1976 was $99,607,439.00 or a profit per acre of the 15,040 acre field of $6,622.84.

When the acre profit is applied to Mr. Young's 169.1 acres we get a figure of $1,119,922.24 which the Court finds is the just and equitable amount which Mr. Young is entitled to receive from the Defendant, Ethyl Corporation, for operation from 1969 up to July 1, 1976 to negative the profit to Ethyl from its continuing trespass and to provide a just and equitable remedy to Mr. Young. The judgment should bear interest at 6% per annum from the date of judgment and the costs of this case should be awarded against the defendant, Ethyl Corporation. No interest should be awarded prior to judgment because of the "good faith" of Ethyl.

The Court finds that the past use of injection wells in the Kerlin field by the Defendant requires that this Court direct Defendant to keep accurate records of total revenue and total costs from and after July 1, 1976 on the Kerlin field operation and that Defendant pay each year 169.1/15,040ths of the net profit from the operation of the Kerlin field to J. M. Young, his successors or assigns, supplying Mr. Young with an accurate accounting as to how the amount paid is determined.

Plaintiff's contention that a disproportionate portion of the common supply described as the Kerlin 15,040 acre field has already been taken from Young's land, is taken care of by directing defendant to account for and pay to plaintiff a 169.1/15,040th so long as the Kerlin field operation is continued just as though it were a unitized operation. In fact it is advantageous to plaintiff since he is not required to pay any part of the initial expense and of building the plant.

And the Court finds it to be an equitable and just advantage due to plaintiff because of the continuing trespass by defendant and the deliberate forced taking of the brine bearing valuable minerals from plaintiff without his consent and is required in order to prevent defendant from making a profit from its trespass.

If, in fact, a disproportionate quantity has already been taken it will adjust itself by the continuous 169.1/15,040ths payment when the Young land may not be producing as much as other parts of the field.

As to all named Defendants except Ethyl the complaint should be dismissed.

One other matter deserves comment by the Court since it was intimated that there was a breach of ethics by Mr. Young and his attorneys in the contingency aspect of trial preparation and presentation of proof. This Court finds no proof of unethical conduct.

The Clerk will prepare proper judgment and order for a continuing accounting.

Appendix A to follow.

## APPENDIX A

KERLIN BRINE AREA
Columbia County, Arkansas
JANUARY 1977          C. F BROWN

## JUDGMENT AND ORDER

Pursuant to the Court's Memorandum Opinion filed this 24th day of February, 1977, it is adjudged and ordered as follows:

1. The Kerlin brine field in Columbia County, Arkansas, is hereby determined to contain 15,040 acres, situated in the follow-section and part sections, as shown by the attached plat:

Township 17 South, Range 20 West:

part of sec. 19, part of sec. 20, part of sec. 21, part of sec. 27, sec. 28, sec. 29, sec. 30, sec. 31, sec. 32, sec. 33, sec. 34, sec. 35, part of sec. 36.

Township 17 South, Range 21 West:

part of sec. 25, part of sec. 36.

Township 18 South, Range 20 West:

part of sec. 1, sec. 2, sec. 3, sec. 4, sec. 5, sec. 6, sec. 7, sec. 8, sec. 9, sec. 10, part of sec. 11, part of sec. 12, part of sec. 15, part of sec. 16, part of sec. 17, part of sec. 18.

Township 18 South, Range 21 West:

part of sec. 1, part of sec. 12.

2. J. M. Young is hereby determined to own 169.1 acres of the 15,040 acre Kerlin field.

3. IT IS ORDERED AND ADJUDGED that the Plaintiff have judgment against the Defendant, Ethyl Corporation, for $1,119,922.24, and costs of this action, said judgment to bear interest at six per cent (6%) per annum from date of judgment.

4. IT IS ORDERED that Plaintiff's cause of action against the limited partnership, Bromet Company, against Great Lakes Chemical Corporation, and against Calvert Exploration Company be dismissed.

5. IT IS FURTHER ORDERED that the Defendant, Ethyl Corporation keep accurate records of the total revenue derived from its operations in the Kerlin field and the total costs expended in such operations and that the Defendant, Ethyl Corporation, account and pay each year to Plaintiff 169.1/15,040ths of its net profit from the operation of the Kerlin field; and that the accounting will date from July 1, 1976, and continue until bromine, ethylene dibromide, vinyl bromide and sulphur production oper-ations cease within the Kerlin field. It is further directed that the Defendant, Ethyl Corporation, keep proper accounting records and submit to Plaintiff, Young, or his designated representative at each pay period as above directed.

6. A copy of this judgment and order will be recorded in the records of Columbia County, Ark., by the Clerk of the Court, and cost of recording charged as costs herein.

## MEMORANDUM OPINION ON RULE 59 MOTION

After an intensive and thorough trial this Court on February 23, 1977 rendered a written opinion finding that the defendant, Ethyl Corporation, should pay $1,119,922.24 to the plaintiff, J. M. Young for the continuing trespass against Mr. Young as damages up to July 1, 1976; and that each year thereafter Ethyl should make an accounting of its profits from the 15,040-acre Kerlin brine field and pay to Mr. Young, his assigns and successors 169.1/15,040ths of the net.

Immediately thereafter on or about March 4, 1977 Ethyl filed motion for new trial and amendment of judgment. Attached to its motion was the affidavit of Mr. Lloyd Andrew who had testified at the trial in chief.

This Court directed that complete discovery be made available and as a result thereof the deposition of Mr. Andrew was taken on July 12, 1977.

Hearing on the Rule 59 Motion was set for final presentation of evidence and argument on September 7, 1977 in the United States District Court room at El Dorado, Arkansas.

At that hearing the deposition of Mr. Andrew was introduced in evidence and in addition Mr. Andrew appeared in person and was examined and cross-examined.

At the conclusion of all evidence on the Rule 59 Motion the Court heard oral argument of the attorneys.

The Motion was taken under advisement and the same is now ready for decision.

In view of the objections made to introducing evidence on the Motion, we first discuss the applicability of Rule 59 to the situation and facts existing in this case and hold that the Defendant's motion and all evidence received thereon are properly before the Court at this time.

█ Rule 59 gives the trial judge power to prevent what he considers to be a miscarriage of justice if and when such a miscarriage is demonstrated. However a court will not grant a new trial unless it is reasonably clear that prejudice or error has crept into the record or that substantial justice has not been done. Furthermore, the burden of showing harmful error rests on the party seeking the new trial.

In the case of *Call Carl, Inc. v. BP Oil Corporation,* D.C., 403 F.Supp. 568 at page 577 appears the following language:

> On a motion for a new trial under Fed.R.Civ.P. 59, a verdict may be set aside and a new trial granted when a new trial would be in the interest of justice, *Aetna Casualty & Surety Co. v. Yeatts,* 122 F.2d 350, 352 (4th Cir. 1941). The burden of showing error at trial warranting a new trial rests on the party seeking a rehearing of the merits. 11 C. Wright and A. Miller, Federal Practice and Procedure, Civil § 2083, at 32 (1973).

Plaintiff's motion contains 17 paragraphs.

Paragraph one is a correct quotation from Rule 59.

Paragraph two states, that the affidavit of Mr. Andrew is attached.

█ Paragraph three states that Ethyl agrees that the Court correctly found that Ethyl was a "good faith trespasser", but that the Court mistakenly applied the incorrect rule of damages and avers that the Court mismatched costs and revenues and omitted the cost items for the first six months of 1976.

The obvious answer to Ethyl's contention in this regard is to call attention again to Exhibit 92 which reveals that no costs for 1976 are shown by that exhibit or any other evidence before the court at time of the trial in chief.

The Court notes that all evidence in the case was concluded by Ethyl without Ethyl offering any evidence as to costs for the first six months of 1976, and Ethyl's present contention reveals that it had the information in its hands and chose not to reveal it to the Court.

The Court further notes that Mr. Andrew, on questioning by the Court on September 7, 1977 stated that the costs of the first six months of 1976 could be used in the next yearly accounting and it could be done with no particular inconvenience or difficulty. He referred to Defendant's Exhibit 109 and stated that said exhibit revealed the additional Bromine cost to be $8,565,000 for the first six months of 1976.

This information was no part of the proof before the Court when the case was decided. Ethyl, in its discretion saw fit not to make this information available to the Court when the Court was attempting to adjudge a fair and equitable remedy in damages for a trespass and the conversion of the materials acquired by reason of the trespass.

Ethyl freely stated that it offered no evidence of costs because it considered, and its theory was, that Mr. Young could recover only a royalty on the brine bearing bromine that came from Mr. Young's land. Ethyl still contends the same thing.

The plaintiff, Mr. Young and the Court in fashioning an equitable remedy were and are almost totally reliant on the records of income and expense kept exclusively by Ethyl and disclosed by Ethyl reluctantly or when ordered by the Court to do so. We refer to that as a fact and not as a criticism since the Court recognizes that Ethyl is trying to make money by using its records and facilities to its own best interest.

Proof in the trial revealed and the Court found that total income was $174,628,439 from the entire Kerlin field of which the Plaintiff owns 169.1/15,040ths.

Ethyl did not see fit to make proof of expenses in excess of the $75,021,000 shown by Exhibit 92, an exhibit prepared by Ethyl.

The Court notes that the proof showed that the total income from the commingled brine bearing bromine processed by Ethyl's plant near Magnolia was shown to the trial court by Ethyl's exhibit 93 as:

| | |
|---|---|
| Elemental bromine | 4,540.596 |
| Ethylene dibromide | 154,394.476 |
| Vinyl bromine | 14,087.900 |
| Sulphur | 1,605.467 |
| | 174,628.439 |

After the case was completely tried and an equitable remedy announced, Ethyl now comes forward with its new calculation as shown by Exhibit D 104 reflecting a contention that only $125,775,000 in revenue came from the Kerlin field and that there was a cost of $95,939,000 or a net profit of $29,-836,000 of which 169.1/15,040ths is only $335,455; whereas the Court, using all available proof in the trial found the 169.1/15,040ths of the profit from the entire operation to be $1,119,922.24.

Ethyl is in the position of saying that it had all the proof available, chose not to reveal it and now says it is revealing the truth and asking that the judgment against it be reduced to $335,455.

When asked by the Court if Ethyl were offering $335,455 as a settlement figure, Ethyl frankly states that it was not, but that it planned an appeal and will contend that it owes merely royalty on the brine.

This Court is fully aware that Mr. Young is equally able to contend on appeal that the figures of Mr. Waddle, his very capable witness, showed damage of $16,000,000 or more to Mr. Young on bromine alone, Plaintiff's contention being that the brine bearing bromine was taken in great quantity from the Young land.

We are also aware that Plaintiff contends that Ethyl has never revealed all of its profit from Tetraethyl lead (the gasoline additive) or Ethyl Dibromide. Plaintiff also contends that $50,000 in law fees have been erroneously included in the costs and that over a million dollars in costs have been used by Ethyl and the Court as a "Know How" item on Exhibit 92.

But the Court was and is concerned with an equitable remedy and the total evidence does not persuade the Court that substantial justice has been denied to either party by the remedy set forth in the February 23, 1977 opinion of the Court.

At this point we quote from paragraph 16 of Ethyl's Rule 59 motion:

At the trial Ethyl did not offer evidence of the cost of producing any of its refined products during the year 1976 because all of the bromine rich brine beneath the Plaintiff's land had been displaced before the end of the year 1975. No evidence of any cost of producing ethylene dibromide and vinyl bromide was offered because Ethyl sincerely believed that the Court would not consider revenues derived from products refined in its Columbia County plant in making its determination as to Plaintiff's damages. The Plaintiff himself tried the case on the theory that he was entitled to damages based only on the values of elemental bromine and sulfur (Plaintiff's Exhibit 28 and 29), and Defendants' evidence of bromine values and costs of production was offered only to counter the inaccurate evidence produced by Plaintiff with respect to bromine values.

Additionally, Ethyl did not offer evidence as to the amount that brine purchased from ARCO contributed to its total "plant revenues" because, again, it genuinely believed that the Court would not consider all such "revnues" in arriving at its judgment.

The statement by Ethyl that it considered all the bromine rich brine beneath Mr. Young's land had been displaced before the end of 1975 was not a concession made on the record in the trial on the merits by Ethyl. Nor did Ethyl at that time concede the accuracy of the highly persuasive evidence of Paul R. Waddle, chief value witness for the Plaintiff.

This Court was aware of Mr. Waddle's evidence in the first trial. The Court was aware that Mr. Waddle very logically testi-

fied that exhibit 28 revealed that Ethyl had taken $6,584,134 worth of bromine and sulphur from Mr. Young's land. Exhibit 28 is as follows:

### AMOUNT AND VALUE OF ELEMENTAL BROMINE AND SULPHUR DISPLACEABLE FROM J. M. YOUNG LANDS

BROMINE–BEARING BRINE DISPLACEABLE FROM J. M. YOUNG LANDS

| | |
|---|---|
| Volume | 12,836,816 Barrels |
| Bromine Recovery | 2.1 Pounds per bbl. |

BROMINE DISPLACEABLE FROM J. M. YOUNG LANDS

| | |
|---|---|
| Amount of Bromine | 26,957,314 Pounds |
| Value of Bromine | $6,531,757 |

SULPHUR DISPLACEABLE FROM J. M. YOUNG LANDS

| | |
|---|---|
| Amount of Sulphur | 5,076,736 Pounds |
| Value of Sulphur | $52,377 |

TOTAL VALUE OF BROMINE AND SULPHUR DISPLACEABLE FROM J. M. YOUNG LANDS

$6,584,134

---

Exhibit 29 to Mr. Waddlle's evidence concerning the total value of bromine and sulphur processed at the Magnolia (Columbia County) plant was and is as follows:

### AMOUNT AND VALUE OF ELEMENTAL BROMINE AND SULPHUR PRODUCED FROM WELLS DIRECTLY OFFSETTING J. M. YOUNG LANDS FROM START UP– TO 10–1–75 and to 11–1–76

| OFFSET WELLS NOS. 18, 18–A & 23 | | |
|---|---|---|
| | As of 10–1–75 | As of 11–1–76 |
| **BROMINE–BEARING BRINE PRODUCED FROM OFFSET WELLS** | | |
| Volume | 32,855,957 Barrels | 36,254,194 Barrels |
| Bromine recovery | 68,997,510 Pounds | 76,133,807 Pounds |
| Value of Bromine | $16,635,299 | $18,447,221 |
| Sulphur recovery | 12,993,613 Pounds | 14,337,523 Pounds |
| Value of Sulphur | $ 134,055 | $ 147,920 |
| **TOTAL VALUE OF BROMINE AND SULPHUR PRODUCED FROM OFFSET WELLS** | | |
| | $16,769,354 | $18,595,141 |

---

All of this evidence was before the Court and was considered by the Court in arriving at a just, fair and equitable remedy for the trespass.

The Court was forced to use the Ethyl records from the Magnolia plant because that is where the commingled brine was taken and processed. Ethyl had not only

the best records, but almost the only records both of income and cost.

Having the records kept at the Magnolia plant the Court used both the revealed income at the plant and the revealed costs at the plant.

Ethyl's motion position is one created by itself deliberately and with full advice of counsel.

Paragraph four of Defendant's Motion is an attack on the boundaries of Kerlin field as announced by the Court. We do not find the evidence under the Rule 59 Motion to over balance the evidence in the case in chief that the Kerlin field is actually 15,040 acres.

Paragraph five complains that 5.81% of brine came from outside the 15,040 acre Kerlin field. This fact together with all cost figures was considered, weighed and evaluated in the original opinion.

Paragraph six is an argument that has been covered in the above discussion concerning Defendant's Exhibit 104 and 109.

Paragraph seven is plaintiff's argument that the equitable remedy fashioned by the Court to fix a just and equitable relief is in reality a unitization of the Kerlin field. While the effect may be the same as is contended by plaintiff, we find that the judgment attacked is the Court's best effort to arrive at a fair, just and equitable remedy for the trespass committed. Admittedly it is innovative, but necessity requires it since never before have we had a case where salt water brine bearing bromine was taken by trespass and it became necessary to fix damages based on that type of trespass.

Paragraph eight is basically an argument that nothing except brine should be considered by the Court in fashioning a just remedy; or in the alternative, that nothing past bromine; and alternatively, no product except those produced by the Magnolia plant. All these arguments were considered by the Court and the Court determined it more fair, just and equitable to consider the total income at the Magnolia plant, the costs as shown by the evidence

and to interpret the same so as to prevent Ethyl from making a prohibitive profit from its trespass.

Paragraph nine alleges a failure of the Court to apply Arkansas law. An examination of the Court's opinion reveals the error of such contention. No theory offered by Ethyl ever attempts to provide a penalty against Ethyl for trespass and no theory of Ethyl makes any attempt to prevent a prohibitive profit to Ethyl. In fact it is patently Ethyl's position that it used its money and know how and it is entitled to all the profit it can amass.

Paragraph ten alleges Ethyl's position that it was entitled to commit the trespass and pay only a small royalty because Mr. Young was and is a man of modest means, unable financially to exploit the brine bearing bromine under his land. This Court dealt with that contention and deliberately refused to find as a fact the matters which Ethyl now states so positively to be the truth. At page 214 of our opinion we said:

> The Court refuses to find in this case that Mr. Young did not have the "desire" to develop the brine bearing minerals from his 169.1 acres and the Court finds that while it is "probable" that Mr. Young did not have the ability and the facilities to recover and treat his minerals, we refuse to make a specific finding to that effect since in this day and time when the value of such minerals is at a high level and the market more readily available, there is a distinct possibility that Mr. Young could have mined and developed his own minerals or leased to someone who actually had the ability and the facilities. We specifically find that the Defendant, Ethyl, as a trespasser, is not entitled to profit from its own wrongdoing.

We find no reason to depart from our previous finding.

Paragraph eleven alleges that this Court misapplied Judge Miller's holding in the case of *National Lead Company v. Magnet Cove Barium Corp.,* 231 F.Supp. 208 (W.D.Ark.1964) and further states that Ethyl contends that valuation should stop

at the bromine stage. Ethyl contends we are here dealing with compounds and that no law of Arkansas permits a court to fashion an equitable remedy. We find that the law of this case as stated by the Court of Appeals is that this Court is required to fashion an equitable remedy based upon the facts of this case.

Paragraph twelve is another attempt to lower the total income of $174,628,439 to the figures shown by Exhibit 104 which was deliberately never placed in evidence by Ethyl in the trial of the case on its merits. We treated that contention in the discussion of paragraph three. We again point out that for all practical purposes Ethyl had control of all records and deliberately decided to use only the proof presented at the first trial. The evidence produced on the Rule 59 Motion is no more persuasive to the Court today than the evidence of Mr. Waddle that $16,000,000 was the damage to Mr. Young at the trial on its merits. But this Court after considering all the evidence announced its conclusion. We see no occasion to depart from that decision.

Paragraph 13 is a dissertation concerning the possibility that the Arkansas legislature would pass laws affecting the remedies available in this case. We judicially note that the Arkansas Legislature met and adjourned without taking such action.

Paragraph fourteen states that Ethyl does not make a determination of its Columbia County Brine field operation because most of the products manufactured in the Columbia County plant are "consumed internally." We considered at the trial and we now consider that the facts here alleged by Ethyl are at least one of the reasons this Court thought the compounds and total income from the field should be used rather than permitting Ethyl to make a prohibitive profit from its trespass. The entire opinion of the Court in the February 23, 1977 opinion is a full explanation of the Court's position based on all the evidence presented before the Court.

Paragraph fifteen is a statement of suggested actions which Ethyl contends would have a tendency to correct the alleged errors of the Court. We have carefully considered each suggestion and find no reason to adopt any of the suggestions. Ethyl will be free to urge such contentions if and when it sees fit to perfect its appeal. The Plaintiff will be free to cross appeal and urge the theory explained by his witness, Mr. Waddle. This Court finds no reason to disturb its decision of February 23rd.

Paragraph 16 adds nothing to Ethyl's previous grounds alleged for a new trial or a reduced judgment except that Ethyl's Attorneys now state they thought the Court would not use such a method as it did to arrive at the conclusion it did. The only answer to such contention is that the Court was presented with the task of finding and announcing a just, fair and equitable remedy for the trespass committed by Ethyl against Mr. Young. The February 23rd opinion announced the Court's judgment in that regard.

Paragraph seventeen asked for oral argument and such argument has been heard and considered.

We specifically find that Ethyl's Motion should be denied. The Clerk will prepare the Order.